FILED

08/11/2025

Clerk of the
Appellate Courts

# THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 22, 2025 Session

## STATE OF TENNESSEE v. ROBERT JOSEPH ATKINS

**Appeal from the Criminal Court for Knox County**
No. 117774   Steven Wayne Sword, Judge

————————————————————

**No. E2024-00320-CCA-R3-CD**

————————————————————

A Knox County jury convicted the Defendant, Robert Joseph Atkins, of delivery of a Schedule I controlled substance (acetylfentanyl) within 1,000 feet of a drug-free zone and delivery of a Schedule II controlled substance (fentanyl) within 1,000 feet of a drug-free zone. On appeal, the Defendant argues: (1) the trial court erred by admitting his statements to law enforcement because new testimony at trial corroborated his claim that his statements were involuntary; (2) the trial court failed to properly instruct the jury on the inference of casual exchange and the order of consideration; and (3) the evidence is insufficient to sustain his convictions. Upon review, we affirm.

**Tenn R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and KYLE A. HIXSON JJ., joined.

Tyler Mark Caviness, Knoxville, Tennessee, for the appellant, Robert Joseph Atkins.

Jonathan Skrmetti, Attorney General and Reporter; William C. Lundy, Assistant Attorney General; Charme P. Allen, District Attorney General; and Teddy Ryan and Sean McDermott, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The facts giving rise to the Defendant's convictions stem from the death of Velma Smith, the victim in this case, on January 19, 2019. At the time of her death, the victim was living at "Beverly Park Place Health and Rehab Center." On January 21, 2019, Lieutenant Heather Reyda of the Knox County Sheriff's Office (KCSO) was assigned to a federal task force investigating drug-related overdose deaths. Based on information obtained from the victim's cell phone and from family members, Lieutenant Reyda

determined that the Defendant had provided the victim with drugs on the day she died. The Defendant was not located by law enforcement until February of 2020. On August 5, 2020, a Knox County grand jury charged the Defendant by presentment with four counts: one count of second-degree murder and three counts of delivery of a controlled substance. The State dismissed the fourth count of the presentment prior to trial. At trial, the jury acquitted the Defendant of the charge of murder in count one. The jury convicted the Defendant on the remaining two counts of delivery of a controlled substance. This appeal concerns only those two convictions.

**Suppression Hearing.** On February 22, 2022, the Defendant filed a motion to suppress the statement he made on February 10, 2020, to Lieutenant Reyda. He argued generally that his statement was involuntary under the 14th Amendment to the United States Constitution and Article I, Section 8 of the Tennessee Constitution. As factual grounds, he asserted that (1) he was incarcerated at the Knox County Detention Center on charges unrelated to this case; (2) because he was in custody he was "deprived of his freedom to not talk to detectives"; (3) he told detectives he did not want to talk to them; (4) he was tased and maced while in custody "which then caused him to be indicted for [Second] degree murder"; (5) at the time of the instant interview he had never been interrogated by law enforcement while in custody; and (6) although he was informed of his rights pursuant to Miranda, under the circumstances, he did not make a knowing and voluntary statement. He argued that the circumstances surrounding his interrogation with Lieutenant Reyda created a coercive environment that influenced his statements. In particular, he claimed that an altercation with correctional officers that occurred before his interrogation caused his statement to be involuntary.

On July 12, 2022, the State filed a detailed response to the Defendant's motion to suppress. The State alleged that on February 10, 2020, the Defendant was incarcerated on a separate charge in the Knox County Jail. He was transported to Visitation Booth 1 to speak to detectives. The Defendant became agitated and advised officers that he would not speak to anyone and wanted to be taken back to his cell. The Defendant then began kicking the door and windows in the visitation booth. The Defendant refused to comply with orders to stop. At 8:16 a.m., officers entered the visitation booth to restrain the Defendant. When officers entered the booth, the Defendant began fighting officers and resisting restraints. One officer maced the Defendant. When the Defendant continued to fight with officers, another officer deployed his taser, making contact between the Defendant's left thigh and left ankle. The Defendant was then able to be restrained. The Defendant was transported to the eye washing station and evaluated by a nurse. The State further averred that after this incident but before he was transported to his cell, the Defendant was informed that the detectives who asked to speak to him were not from the Knoxville Police Department asking about his pending first-degree murder charge. Upon learning that the officers were from the Knox County Sheriff's Office

- 2 -

asking about an unrelated matter, the Defendant agreed to make the instant statement. Based on these facts, the State argued the Defendant's statement was voluntary and that his motion should be denied.

On July 14, 2022, the trial court conducted a suppression hearing and heard testimony from Lieutenant Reyda and the Defendant. At the hearing, a video of the altercation at the jail taken from an officer's body camera footage, the Defendant's interview with Lieutenant Reyda, and a waiver of rights form signed by the Defendant were admitted as exhibits. The Defendant's interview was audio recorded only, and an hour and a half in duration.

At the beginning of the recording, Lieutenant Reyda can be heard reading the Defendant his Miranda rights. The Defendant waives his rights, and he signs the waiver of rights and admonition form. For the first thirty minutes of the interview, Lieutenant Reyda and the Defendant are cordial, and the Defendant can be heard accepting and eating food. Lieutenant Reyda refers to the Defendant as "Jody" at times throughout the recorded interview. The Defendant asks them why they are talking to him, and the detectives tell him that they know he is not a major drug dealer that has a stash of drugs somewhere. The detectives tell the Defendant they have video of him going to the victim's residence on the day she died. He initially denied going to her residence, but he acknowledged that they were very good friends. He later admits that he went to her residence; however, he denied that he provided her with any drugs. Throughout the interview the Defendant discusses his friendship with the victim, his desire to find out who gave her fentanyl, other people in the community on drugs, his relationships with other women in the community, and various other topics. He continues to talk during the interview unprompted by the detectives. While he was initially given something to eat, he asked for a "hot meal," and was later provided a chicken pot pie. The Defendant asked for the handcuffs to be removed, and the detectives obliged him. At this point, he told the detectives that the dope that killed the victim came from "Bug." When asked how he knew the dope came from Bug, the Defendant told the detectives he did not want to "take the stand." When asked how he knew Bug provided the victim with the "dope," the Defendant said he gave the victim the dope. When detectives began to press the Defendant about how he got the drugs from Bug, the Defendant said he could not help the detectives unless they did "it" the way he told them to. The detectives explained that they could not make a deal with him without asking their superiors. The Defendant continued to give various information about Bug to the detectives; however, he did not tell them his last name. The Defendant also told the detectives he hoped this information helped him at trial in his other unrelated case. While attempting to determine the identity of Bug, the Defendant freely talked with the detectives about his children and other crimes about which he was aware. The Defendant and Lieutenant Reyda continue to be cordial, make jokes, and laugh until the interview ends.

The recording taken from the body camera footage showed that at 8:16 a.m. on the morning of the interview, the Defendant was in an altercation with correctional officers during which he was tased and maced. The recording begins in slow stop camera action and does not clearly capture how the altercation began or when the Defendant was tased. However, the State did not dispute that the Defendant was tased and maced that morning.

Lieutenant Reyda testified that after discovering the Defendant was in custody for a separate crime, she called the jail and asked if he could be transported to another facility so that she could interview him the next morning. She arrived with her partner the following morning, and she was not aware of the altercation that had occurred earlier that morning. Lieutenant Reyda learned about it after conducting the interview with the Defendant. Lieutenant Reyda informed the Defendant that she was not with the Knoxville Police Department (KPD) and she was not there to speak about the shooting for which he was currently in custody. She stated that the Defendant then agreed to talk with her and went to the room where the interview took place. She agreed the Defendant was cordial and that she had her recording device with her. She read the Defendant his Miranda rights, and he executed a written waiver of those rights by providing his initials and signature to show that he understood them.

Lieutenant Reyda agreed that the Defendant indicated he was willing to make a voluntary statement. The Defendant never indicated he did not want to speak with her, and she described him as "extremely cooperative." She further testified that nothing about the Defendant's behavior or demeanor appeared in any way coerced or made her question whether he was speaking to her unwillingly. Lieutenant Reyda confirmed that she conducted the interview at approximately 10:38 a.m. that morning. She agreed that during the interview the Defendant was provided with food and drink.

Lieutenant Reyda said the Defendant did not mention anything to them about the altercation that occurred earlier that morning. Based on her twenty-nine years of experience, she did not observe anything about the Defendant's conduct or behavior to indicate he was giving an involuntary statement. In fact, she said the Defendant was "very touched to speak about the victim. . . . He knew her very well and was very close to her." She said the Defendant "became a little emotional, just speaking about her and missing her and that kind of stuff."

On cross-examination, Lieutenant Reyda agreed that she had attempted to indict the Defendant a year prior to his case; however, she was told she did not have enough information. Although she believed she had enough information to indict him previously; upon speaking with the district attorney, she learned a statement from the

Defendant would strengthen the case. She agreed that she attempted to obtain a statement from the Defendant in late 2019 or early 2020; however, she could not locate him. She agreed that when she arranged to speak with the Defendant on the instant offenses, he was being housed in the detention facility or the "DF" and had to be transported to the Knox County Jail or the "KCJ". She had the Defendant transferred to the KCJ because she wanted access to her computer during the interview. She acknowledged the Defendant was transported "quite a bit earlier" than when her interview began; however, she could not recall whether anything happened to the Defendant before the interview.

The Defendant testified that on the day he spoke with Lieutenant Reyda he was awakened by correction officers around 2:30 and 3:00 o'clock in the morning and "told I had to go." When he refused, they told him he would be placed "on disciplinary, so I had to go." He said he arrived downtown between 4:30 or 6:00 o'clock that morning. Asked if he knew why he was to be transported, the Defendant said, "They told me to speak to the detective, but I had already told them I didn't want to speak to no detectives, I had that right. I knew I had that Fifth Amendment right, but they said they were going to make me speak to them anyways." The Defendant said that "Lieutenant Turner" told him they were going to make him speak to the detectives. The Defendant said he had "paperwork" to verify that one of the officers admitted that he said he did not want to talk to the detectives. He said that prior to speaking to Lieutenant Reyda, the officers tased and maced him for "no reason" and that he "didn't do nothing" other than say "you cannot make me go talk to the detectives." He said he never assumed a fighting stance towards the officers and that the incident only occurred to subdue him into speaking to detectives. He described the tasing as extremely painful and said his eyes burned for over an hour afterward.

He further testified that before the recording of the interview began, he told Lieutenant Reyda he did not want to talk. He claimed she instructed him to "take the charge" and make up a story. He said he fabricated a statement because he was scared and under pressure following the use of force. He testified that "everything was coerced" and that he only complied to avoid further tasing or macing.

On cross-examination, the Defendant denied that before the altercation took place, he was repeatedly kicking the door, however, he agreed to beating on the wall of the holding cell. He said he kicked the door to get the officer's attention to tell them he did not want to talk to anybody. He stated that he was told to stop this behavior. He stated again that Lieutenant Reyda's testimony was a lie. On redirect examination, the Defendant testified that he only spoke with Lieutenant Reyda because he was afraid. On recross-examination, he admitted that there was no recording of his claim that he told Lieutenant Reyda he did not want to speak to her.

- 5 -

The trial court denied the motion by written order on August 1, 2022. After setting forth its findings of fact and considering the relevant law, the trial court determined that the Defendant's statement was not the result of coercion and was the product of his own freewill. The court determined the Defendant's testimony was not credible and that there was no evidence that the Defendant's altercation with correction officers, which occurred two hours prior to his interview with Lieutenant Reyda, had any bearing on, or was any way connected to, the voluntariness of his statement. The trial court determined that the correction officers' actions were meant to restrain him and the Defendant's statements were not the product of state action.

**Trial**. On January 19, 2019, KCSO Officer Kimberly Trotter responded to a rehabilitation facility where she discovered the deceased victim. She found a cell phone and a needleless syringe next to the victim's body. The victim's body was transported to the medical examiner's office, where an autopsy technician found a small baggie containing a white powdery substance in the victim's body bag. The baggie was sent to Tennessee Bureau of Investigation (TBI) for forensic testing of the substance. Hannah Peterson, a Special Agent Forensic Scientist with the TBI, testified that the content of the baggie tested positive for acetylfentanyl, heroin, cocaine, and fentanyl.

Dr. Christopher Lochmuller, Deputy Chief Medical Examiner for Knoxville and Anderson Counties, conducted the victim's autopsy. He collected blood samples and sent them to NMS Laboratories for toxicology testing. William Schroeder, a forensic toxicologist, examined the blood samples and concluded that the victim's blood contained: 91 nanograms of oxycodone; 1 ng/ml of oxymorphone, which is an active metabolite of oxycodone; 3 ng/ml of fentanyl; and 2.2 ng/ml of acetylfentanyl, which is a fentanyl analog. Based on Schroeder's report, Dr. Lochmuller concluded that the victim died of a combined overdose of acetylfentanyl, fentanyl, and oxycodone.

Knoxville Police Investigator Andrew Olson extracted data from the victim's cellphone and obtained the call log from January 19, 2019. The call log showed that the victim contacted "Jody" and received numerous calls from "Jody" on January 19, 2019. The phone records specifically revealed the victim received a 29-second call from "Jody" at 5:21:36 p.m. on January 19, 2019. Additionally, Investigator Olson obtained a log of the victim's SMS text messaging activity that showed the victim sent messages to, and received messages from, "Jody" on the day that she died. The log revealed the victim sent a text message to "Jody" at 5:12:57 p.m. that read, "5321 Beverly Park Circle," and another at 5:21:24 p.m. that read "340," which was her room number at the rehabilitation center.

Video surveillance recordings from the rehabilitation center on the day of the offense were placed on a compact disc and introduced as an exhibit at trial. One recording showed a vehicle matching the description of the victim's vehicle drive-up to

the facility and park and an individual exit the vehicle. Another recording shows a person later determined to be the Defendant enter the rehabilitation center lobby between 5:20 and 5:21 p.m. while making a phone call at 5:21 p.m. Another recording shows the Defendant leaving the rehabilitation center through the lobby around 5:29 p.m. And the final recording shows an individual entering the same car and driving away. Law enforcement attempted to locate the Defendant following the victim's death and was unable to find the Defendant for several months.

Matthew Williams, a correctional officer at the Knox County Jail in February 2020, testified that an altercation occurred at the Knox County Jail around 8:15 a.m. on February 10, 2020. He said the Defendant was kicking and banging on the walls and the window of his cell before his interview with Lieutenant Reyda. He stated that the Defendant said he did not wish to speak with detectives. Williams admitted that his body camera footage did not show the Defendant raise his fist at the officers. However, he said the Defendant took a fighting stance when he entered the cell and the officers' actions were meant to restrain him.

Lieutenant Reyda testified that on February 10, 2020, she learned that the Defendant was in custody on an unrelated first-degree murder charge being investigated by the Knoxville Police Department. Around 8:15 a.m., correction officers entered and restrained the Defendant after he became visibly upset in his cell. Later that morning, at approximately 10:30 a.m., Lieutenant Reyda conducted an audio recorded interview with the Defendant, which was admitted as an exhibit and played for the jury at trial. The Defendant was advised of his Miranda rights, signed a written waiver, and agreed to speak to the detectives.

During the interview, the Defendant confirmed that he used the name "Jody." He admitted that the victim asked him for heroin and crack cocaine on the day she died, but he claimed that he was unable to find any drugs. He identified himself as a "middleman," and said that a man known as "Bug" had supplied the drugs that the victim received.

When asked why he believed the drugs came from "Bug," the Defendant replied, "[J]ust trust me." He told Lieutenant Reyda that he knew that "the dope" came from "Bug." The Defendant then admitted that he brought the victim "the dope" and that he got it from "Bug." He claimed to have asked "Bug" if the drugs contained fentanyl, to which "Bug" responded that they did not contain enough to be lethal. The Defendant stated that had he known the drugs were deadly, he would have killed "Bug" himself. The Defendant then stated that he did not give fentanyl to his people if they were not fentanyl users and that he would give heroin to them if they were heroin users. Based on the information collected throughout her investigation, Lieutenant Reyda concluded that the Defendant delivered the baggie of drugs to the victim.

Donna Roach, an employee of the Knoxville/Knox County KUB Geographic Information System, worked as a map analyst for Knoxville, Tennessee. She testified at trial concerning the location of the rehabilitation center where the victim was living. She testified that the center was located at 5321 Beverly Park Circle and the property boundary was within 1,000 feet of Beverly Park. Jason Haliburton, the park maintenance director of Knox County Parks and Recreation, testified that Beverly Park is a 90-acre park in Knox County open to the public and frequented by children.

At the conclusion of trial, the trial court instructed the jury on the order it was to consider greater and lesser included offenses of delivery of a controlled substance and casual exchange. The trial court further instructed the jury on the statutory inference of casual exchange as required. The jury convicted the Defendant of counts two and three of the presentment, which charged him with delivery of fentanyl and delivery of acetylfentanyl within a drug free zone. For count two, the Defendant was sentenced to serve six years, to be served consecutively to a sentence imposed in a separate case. For count three, he received a twelve-year sentence, to be served concurrently with count two in this case. The Defendant filed a timely motion for a new trial on October 23, 2023. The trial court heard his motion on February 1, 2024, and denied it the same day. This case is now properly before this court for review.

## ANALYSIS

The Defendant contends that new trial testimony corroborates his suppression hearing testimony, demonstrating that his statement to law enforcement was involuntary. The State argues that this issue has been waived. The Defendant also asserts that the trial court erred in instructing the jury on casual exchange and the order in which the offenses were to be considered. In addition, he challenges the sufficiency of the evidence supporting his conviction on both counts. The State responds that the jury instructions were proper and that the evidence is sufficient. We agree with the State.

Motion to Suppress. The Defendant argues that his statement to Lieutenant Reyda was involuntary under the Due Process Clause because the nature of the circumstances surrounding his custodial interrogation was coercive. He contends that new trial testimony from Officer Williams corroborates his claim that he was tased and pepper sprayed after stating he did not want to speak to detectives and despite offering no resistance. This evidence, he argues, demonstrates that his will was overborne by the use of force and intimidation and that the trial court erred in finding his statement voluntary and in admitting it at trial. The State responds that the Defendant waived this argument by failing to ask the trial court to suppress his statement to Lieutenant Reyda in light of Officer Williams's trial testimony and by failing to make such argument in his motion for a new trial. We conclude that the Defendant waived this issue and that it does not rise to plain error.

The record demonstrates that the Defendant did not ask the trial court to suppress his statement to Lieutenant Reyda in light of Officer Williams's trial testimony and did not raise this issue in his motion for new trial. "Our appellate courts have consistently maintained that we will not entertain new issues on appeal when the trial court was not presented with an opportunity to consider those issues in the first instance." State v. Avant, No. W2018-01154-CCA-R3-CD, 2019 WL 3072131, at *6 (Tenn. Crim. App. July 12, 2019); Tenn. R. App. P. 36(a); State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996) ("Ordinarily, issues raised for the first time on appeal are waived."). As a result, the Defendant has waived our consideration of whether the trial court erred in its ruling on the suppression of the statement made to Lieutenant Reyda.

Although this court has the discretion to address waived errors under the plain error doctrine, we decline to exercise such discretion in this case. See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."). Appellate counsel did not request plain error review in the Defendant's initial brief and did not respond to the State's waiver argument in the Defendant's reply brief. See State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) ("It is the accused's burden to persuade an appellate court that the trial court committed plain error."); State v. Thompson, No. W2022-01535-CCA-R3-CD, 2023 WL 4552193, at *5 (Tenn. Crim. App. July 14, 2023) ("Where a defendant fails to respond to a waiver argument, only particularly compelling or egregious circumstances could typically justify our sua sponte consideration of plain error."). Therefore, we conclude that the Defendant is not entitled to plain error relief on this issue.

Jury Instructions. The Defendant argues that the trial court erred by instructing the jury that it could consider the lesser included offense of casual exchange only if it first acquitted him of delivery of a controlled substance because this improperly limited the jury's ability to fully consider all relevant charges. He asserts that this error violated his constitutional right to trial by jury. The Defendant did not raise this issue at trial or in his motion for new trial and requests that this court review the issue for plain error. The State contends that the Defendant cannot establish a clear and unequivocal rule of law was violated or that the order of consideration instruction had any effect on the verdict. We agree with the State.

The Defendant contends that Tennessee law prevents juries from adequately distinguishing between felonies and lesser-included offenses—in this case, delivery of a controlled substance (a felony) and casual exchange (a lesser-included offense). He argues that the elements required to prove delivery are effectively a subset of those needed to prove casual exchange because a jury must find the additional element that the

transaction was "without design" to convict on casual exchange. He further asserts that the trial court's instruction on the statutory inference—though legally correct—was ineffective due to its placement within the overall jury charge. Specifically, he claims that the instruction was not given in the correct order to allow the jury a meaningful opportunity to consider it. This, he argues, undermined his constitutional right to a jury trial.

In support of his argument, the Defendant draws an analogy to case authority discussing the risks associated with sequential jury instructions involving second-degree murder and voluntary manslaughter cases. See State v. Humphrey, No. M2003-01489-CCA-R3-CD, 2005 WL 2043778 (Tenn. Crim. App. Aug. 24, 2005) (Tipton, J., concurring). He also relies on Black v. Tennessee, No. 24-6586, 2025 WL 1787668, at *3 (U.S. June 30, 2025) (statement of Sotomayor, J., respecting the denial of certiorari), which addresses due process concerns with sequential jury instructions in Tennessee's manslaughter cases. While we recognize the Defendant's argument and the broader policy concerns it raises, we are bound by the following clearly established precedent.

The Defendant failed to raise this issue in his motion for a new trial and thus requests plain error review. Tenn. R. Crim. P. 30(b); Tenn. R. App. P. 3(e). The plain error doctrine states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). "To rise to the level of plain error, [a]n error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding." Id. (alteration in original) (citations and internal quotation marks omitted). In order for this court to find plain error,

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)).

"[P]lain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (internal quotations marks and citations omitted). The defendant bears the burden of persuading an appellate court that the trial court committed plain error and that the error was sufficient magnitude that it likely changed the outcome of the trial. State v. Clayton, 535 S.W.3d 829, 848 (Tenn. 2017). "[T]he presence of all five factors must be established by the record before this

Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

The right to trial by jury is guaranteed by the United States and Tennessee Constitutions. U.S. Const. amend. VI; Tenn. Const. art. I, § 6. "[I]t follows that a defendant has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000) (citing State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Trial courts have a duty to give "'a complete charge of the law applicable to the facts of a case.'" State v. James, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)).

When reviewing challenged jury instructions, we must look at "the charge as a whole in determining whether prejudicial error has been committed." In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987) (citation omitted); see State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). "'An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law.'" State v. Majors, 318 S.W.3d 850, 864-65 (Tenn. 2010) (quoting State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005)); see State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); Graham v. State, 547 S.W.2d 531, 544 (Tenn. 1977)).

Tennessee Code Annotated section 39-17-419 establishes a statutory inference that must be presented to the jury when casual exchange is included in the instructions as a lesser-included offense of felony delivery. This inference permits the jury to conclude, based on the surrounding circumstances, that a casual exchange occurred rather than a felony drug delivery. State v. Helton, 507 S.W.2d 117, 121 (Tenn. Crim. App. 1974).

At the Defendant's trial, the trial court instructed the jury on the full statutory inference of casual exchange as required by Tennessee Code Annotated section 39-17-419; See Helton, 507 S.W.2d 117 (holding that the trial court's failure to provide the full statutory inference instruction to the jury constituted reversible error). The trial court further instructed the jury on the order in which it was to consider greater and lesser included offenses. That instruction provides, in relevant part: "[y]ou shall not proceed to consider any lesser included offense until you have first made a unanimous determination that the defendant is not guilty of the immediately preceding greater offense or you unanimously have a reasonable doubt of the guilt of the defendant's guilt of that offense."

The Defendant cannot establish that a clear and unequivocal rule of law was breached or that a substantial right was adversely affected. The Tennessee Supreme

- 11 -

Court has expressly held that "acquittal-first" jury instructions do not violate a defendant's constitutional right to a trial by jury. State v. Davis, 266 S.W.3d 896, 904-05 (Tenn. 2008) ("[W]hile a defendant is entitled by our constitution to have the jury charged on all offenses encompassed within the indictment and supported by the proof, our constitution does not go so far as to mandate the order in which those offenses are considered.").

This court has consistently held that the use of sequential jury instructions does not prevent a jury from returning a verdict on a lesser-included offense. See, e.g., State v. Black, No. E2022-01741-CCA-R3-CD, 2024 WL 2320284, at *28 (Tenn. Crim. App. May 22, 2024); State v. Peters, No. E2014-02322-CCA-R3-CD, 2015 WL 6768615, at *5 (Tenn. Crim. App. Nov. 5, 2015), perm. app. denied (Tenn. Apr. 7, 2016) (holding that there was no plain error in the order-of-consideration instruction for delivery of a controlled substance and casual exchange). Because the Defendant has failed to establish that a clear and unequivocal rule of law was breached or that a substantial right was adversely affected, he is not entitled to plain error relief.

Sufficiency of the Evidence. The Defendant argues that the verdict is against the weight of the evidence. He asserts that the proof at trial supports, at most, a conviction for the lesser-included offense of casual exchange. In support of this position, he urges this court to reinterpret the term "deliver" in Tennessee Code Annotated section 39-17-417 to require a showing that a transfer was made with a "predetermined design or plan." He contends that this clarification is necessary because, under the current interpretation, the statute permits a felony conviction for delivery based on fewer elements than are required for the misdemeanor offense of casual exchange. The State disagrees, contending that no redefinition is needed and that adopting such a change would intrude on legislative authority. The State further argues that the evidence is sufficient to support the Defendant's convictions. We agree with the State.

We decline to adopt the Defendant's proposed reinterpretation of the term "deliver." Courts must interpret statutes as written and are not free to rewrite legislative language. See Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995); In re Conservatorship of Clayton, 914 S.W.2d 84, 90 (Tenn. Ct. App. 1995). The term "deliver" is defined by statute as "the actual, constructive, or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship." Tenn. Code Ann. § 39-17-402(6). This definition does not require proof of a "predetermined plan" to deliver a controlled substance. We presume the legislature chose its language purposely and that each word carries meaning. Locust v. State, 912 S.W.2d 716, 718 (Tenn. Crim. App. 1995). Therefore, any changes to the statutory definition are properly left to the legislature.

- 12 -

We next turn to whether the evidence presented at trial is sufficient to support the Defendant's conviction for delivery of a controlled substance. "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing Majors, 318 S.W.3d at 857).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

Tennessee Code Annotated section 39-17-417(a)(2) provides: "It is an offense for a defendant to knowingly . . . [d]eliver a controlled substance." A person "acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-106(a)(23). "'Deliver' or 'delivery' means the actual, constructive, or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship." Tenn. Code Ann. § 39-17-402(6). Proof of intent usually consists of circumstantial evidence and the inferences that can be reasonably drawn from that evidence. See Hall v. State, 490 S.W.2d 495, 496 (Tenn. 1973). At the time of this incident, if the offense occurred within 1,000 feet of the real property of any school, the offense was punished one classification higher. Tenn. Code Ann. § 39-17-432 (Supp. 2019).

The Defendant asserts that the jury could not have reasonably concluded that the transaction amounted to a felonious delivery rather than a casual exchange. Tennessee

- 13 -

law permits a jury to infer from the surrounding circumstances that a small-scale transfer of a controlled substance was not made with the purpose of selling or dispensing in violation of section 39-17-417(a), but rather was a casual exchange. Tenn. Code Ann. § 39-17-419; see Tenn. Code Ann. § 39-17-418 ("It is an offense for a person to knowingly possess or casually exchange a controlled substance."). The statutory inference provides:

> It may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing. It may be inferred from circumstances indicating a casual exchange among individuals of a small amount of a controlled substance or substances that the controlled substance or substances so exchanged were possessed not with the purpose of selling or otherwise dispensing in violation of § 39-17-417(a). The inferences shall be transmitted to the jury by the trial judge's charge, and the jury will consider the inferences along with the nature of the substance possessed when affixing the penalty.

Tenn. Code Ann. § 39-17-419.

"A 'casual exchange' contemplates a spontaneous passing of a small amount of drugs, for instance, at a party. Money may or may not be involved." State v. Copeland, 983 S.W.2d 703, 708 (Tenn. Crim. App. 1998). A transaction will not be deemed a casual exchange if there was a design or previous plan to make the exchange. State v. Carey, 914 S.W.2d 93, 96 (Tenn. Crim. App. 1995); Loveday v. State, 546 S.W.2d 822, 826 (Tenn. Crim. App. 1976). An "exchange" involves the giving or transferring of something in return for equivalent consideration, and the term "casual" denotes a transaction made "without design." Helton, 507 S.W.2d at 120. "Whether a transfer was [a] 'casual exchange' is to be determined from all the facts and circumstances of the case." State v. Prince, 713 S.W.2d 914, 918 (Tenn. Crim. App. 1986) (citing Helton, 507 S.W.2d at 121).

Viewing the evidence in the light most favorable to the State, the record demonstrates that on January 19, 2019—the day of the victim's death—the Defendant spoke with her on the phone and exchanged text messages regarding the victim's room number and the address of the rehabilitation center. The location was within 1,000 feet of a school. The Defendant entered the center, remained for only eight minutes, and later confessed to Lieutenant Reyda that he "brought" her "the dope." Additionally, the Defendant admitted that the victim asked him to bring her heroin and cocaine that day. The evidence showed that a small baggie of an off-white rock

substance was found in the victim's body bag. The substance was identified as containing acetylfentanyl, heroin, cocaine, and fentanyl.

Under these facts, a rational juror could conclude that the transaction was with design and that the Defendant knowingly transferred a Schedule I (acetylfentanyl) and Schedule II (fentanyl) controlled substance to the decedent. The trial court properly instructed the jury on both the offense of delivery of a controlled substance and the lesser-included offense of casual exchange, including the applicable inference. The Defendant argued at trial that the transaction was merely a casual exchange, and the jury, as was their prerogative, rejected this theory and found him guilty of delivery of a controlled substance beyond a reasonable doubt.

The jury determines the weight and credibility to be given to the testimony of witnesses and reconciles all conflicts in the evidence. Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966). Moreover, we note again that "our duty on appeal of a conviction is not to contemplate all plausible inferences in the Defendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011). We decline to re-weigh the evidence or substitute our inferences for those of the jury. Wagner, 382 S.W.3d at 297. Based on the evidence, a rational juror could conclude beyond a reasonable doubt that the Defendant knowingly delivered a Schedule I (acetylfentanyl) controlled substance and Schedule II (fentanyl) controlled substance within a drug-free zone. Accordingly, the Defendant is not entitled to relief.

Finally, on June 23, 2025, the Defendant filed a pro se motion to dismiss or for a new trial. A criminal defendant has the right to representation by counsel or to proceed pro se, but not both simultaneously. See State v. Hester, 324 S.W.3d 1, 31 (Tenn. 2010); see also State v. Burkhart, 541 S.W.2d 365, 371 (Tenn. 1976). Because the Defendant is currently represented by appointed counsel, this court will not consider his pro se filing. Accordingly, with the filing of this opinion, this court dismisses the Defendant's pro se motion.

## CONCLUSION

Based on the foregoing, the judgments of the trial court are affirmed.


s/ Camille R. McMullen_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE

- 15 -